UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20053-CIV-GAYLES/MCALILEY

DEUTSCHE BANK SECURITIES INC.,

    Plaintiff,

vs.

NELSON F. CASSIS SIMON, *et al.*,

    Defendants.

_____/

## OMNIBUS REPORT AND RECOMMENDATIONS ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO <u>DISMISS OR COMPEL ARBITRATION</u>

Plaintiff Deutsche Bank Securities, Inc. ("DBSI") filed a Motion for Preliminary Injunction, (ECF No. 6), and Defendants Nelson E. Cassis Simón, Lucia Victoria Simón de Cassis, Nelson de Jesus Cassis Zacarias, Mauricio Cassis Simón, and Rolando Martin Cassis Simón (the "Cassis Family") filed a Motion to Dismiss and to Compel Arbitration (ECF No. 12). The Honorable Darrin P. Gayles referred both motions to me, (ECF No. 24), and they are fully briefed. (ECF Nos. 13, 16, 18, 19). Having reviewed the parties' memoranda of law and the evidence cited therein, the pertinent portions of the record and the applicable law, for the reasons explained below, I recommend that the Court deny Plaintiff's Motion for a Preliminary Injunction and grant Defendants' Motion to Dismiss and Compel Arbitration.

1

## I. BACKGROUND

DBSI filed this action to enjoin a pending arbitration which the Cassis Family instituted against it before the Financial Industry Regulatory Authority ("FINRA"). (ECF No. 1). DBSI is a securities broker/dealer and member firm of FINRA. (ECF No. 1 at ¶ 1). The Cassis Family commenced arbitration "to recover in excess of $400,00.00 in losses caused by [DBSI's] misconduct when recommending and selling… the '5 Year Deutsche Bank USD Quintus Series A 100% Principal Protected Note'" (the "Quintus Notes"). (ECF No. 1-1 at 2). The person who allegedly recommended the Quintus Notes to the Cassis Family is Jose Luis Llamas ("Llamas"), the Cassis Family's "long-term advisor." (*Id*. at 5).

At the time of the events in question, which took place in 2013, Llamas was an employee of DBSI and was registered with FINRA as a securities broker for DBSI. (ECF Nos. 13-1 at 2-7, 13-2 at ¶¶ 3-5). During this period, Llamas was also an employee of Deutsche Bank Trust Company Americas ("DBTCA"), which provides traditional banking services. (ECF Nos. 13-1 at 7, 13-2 at ¶¶ 3-5, 17 at ¶ 10). The "dual-hatted" nature of Llamas' role is reflected in an email that he sent to the Cassis Family regarding the Quintus Notes, wherein his signature block identifies him as a managing director of DBTCA, underneath which it states "[s]ecurities offered through [DBSI]." (ECF No. 13-5 at 2).

Deutsche Bank AG, Frankfurt issued the Quintus Notes, (ECF No. 7-1 at 3), and the Cassis Family purchased the Notes through Deutsche Bank (Suisse) SA. (ECF Nos. 7-3, 7-4). The term sheet for the Quintus Notes states that "[t]hese securities have not been registered under the United States Securities Act of 1933, as amended…" and it warns that

2

the Quintus Notes should not be marketed or sold "to US persons or within the United States." (ECF No. 7-2 at 18). In the course of the Cassis Family's Quintus Notes transaction, the Quintus Notes were never held in a DBSI account, and no funds were transferred into or out of, nor was any collateral referenced or held, in a DBSI account. (ECF No. 7 at ¶ 8). The Cassis Family does not have an account at DBSI, and did not enter into a written arbitration agreement with DBSI. (ECF No. 17 at ¶ 9).

The arbitration Statement of Claim alleges that DBSI, through Llamas and other unidentified individuals all of whom are characterized as "associated persons, agents of and/or employees with, Deutsche Bank," (ECF No. 1-1 at 4, ¶ 10) negligently and fraudulently led the Cassis Family to invest in the Quintus Notes. (ECF No. 1-1). The Cassis Family asserts several claims against DBSI in the FINRA arbitration: (1) "failure to treat Claimants in a just and equitable manner," (2) breach of fiduciary duty, (3) "violations of FINRA conduct rules and [DBSI's] own internal rules," (4) negligence, negligent supervision, and negligent misrepresentations and omissions, (5) unjust enrichment and (6) common law fraud, constructive fraud, and fraudulent misrepresentations. (ECF No. 1-1 at 10). As explained below, the negligent supervision claim is critical to my conclusion that the Court should compel arbitration.

The Statement of Claim further alleges that FINA has jurisdiction pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes (the "FINRA Code"). (*Id*. at 3). Rule 12200 "requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand." *Pictet Overseas, Inc. v. Helvetia Trust*, 905 F.3d 1183, 1187 (11th Cir. 2018).

3

DBSI contends that FINRA Rule 12200 does not apply to the Cassis Family's claims. DBSI argues that this is so because Llamas did not act on its behalf in the Cassis Family's Quintus Notes transaction, but rather, he acted on behalf of DBTCA which is not a FINRA member. On this basis DBSI asks the Court to preliminarily enjoin the arbitration proceeding because Rule 12200 does not require arbitration. (ECF No. 6). The Cassis Family opposes the issuance of a preliminary injunction, and filed a motion to dismiss this action and compel arbitration, contending that their arbitration proceeding is mandated by Rule 12200. (ECF No. 12).

The parties' briefing and supporting declarations largely focus on the capacity in which Llamas worked when he recommended the Quintus Notes to the Cassis Family: was was he acting an employee of DBSI, or was he acting as an employee of DTBCA? (hereafter, "Llamas' capacity"). After carefully reviewing the evidence submitted, the Court held two status conferences with the parties to discuss its view that the factual record is not sufficiently developed for the Court to determine the answer to this question. The Court explained that the significant gaps in the record regarding Llamas' capacity made it unlikely the Court could grant either pending motion.

The Court offered the parties an opportunity to take limited discovery regarding Llamas' capacity. At the Court's suggestion, the parties proposed expedited deadlines to complete discovery, submit summary judgment motions and hold oral argument. The Court entered a Scheduling Order with those deadlines. (ECF No. 33).

The Court has since closely studied the Eleventh Circuit decisions that address arbitrability under FINRA, and its predecessor, the NASD Code of Arbitration Procedure.

4

Despite the parties' focus on whether Llamas was acting on behalf of DBSI or DBTCA (or a different Deutsche Bank entity), this legal authority makes clear, on the undisputed facts in this record, that Llamas' capacity is not the relevant inquiry. It is undisputed here that (1) the Cassis Family was a customer of Llamas, (2) Llamas was an employee and registered representative of DBSI during the relevant time period, and (3) the Cassis Family has asserted a negligent supervision claim against DBSI in the arbitration.

In light of these undisputed facts, as explained further below, controlling Eleventh Circuit precedent dictates that Rule l2200 applies, and mandates arbitration, because (1) for purposes of arbitrability, Llamas was an "associated person" of DBSI during the relevant time period irrespective of whether he actually acted on its behalf in the Quintus Note transaction,  (2) given Llamas' status as an associated person of DBSI, the Cassis Family's dispute regarding his conduct is necessarily a dispute between a customer and DBSI, and (3) the Cassis Family's negligent supervision claim renders their dispute one that "arises in connection with the business activities" of DBSI. FINRA Rule 12200.

## II. ANALYSIS

### A. Legal Standard

To obtain a preliminary injunction, DBSI must demonstrate "(1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1306 (11th Cir. 1998). DBSI bears the burden of persuasion to establish all four elements.

5

*Id.* at 1306. The first element, substantial likelihood of success on the merits, is generally the most important. *Schiavo ex rel. Shindler v. Schiavo*, 357 F.Supp.2d 1378, 1383 (M.D. Fla. 2005). For the reasons that follow, I conclude that Plaintiff cannot satisfy this burden of proof.

In its evaluation of a motion to compel arbitration, the Court considers three factors: (1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived. *Mercury Telco Group, Inc. v. Empresa De Telecom. De Bogata S.A. E.S.P.*, 670 F.Supp.2d 1350, 1354 (S.D. Fla. 2009). Here, only the first factor is in dispute: whether a valid written agreement to arbitrate exists. The parties here agree – as the Eleventh Circuit holds – that the FINRA Code constitutes a written agreement to arbitrate. *See Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004).[1] Thus, if the Court determines that the elements of Rule 12200 are satisfied here, it must compel arbitration. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (the Federal Arbitration Act "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (emphasis in original). The Court applies a "summary-judgment-like standard" in making this determination, and "may conclude as a matter of law that parties did or did

---

[1] *King* and *MONY* involved the NASD Code of Arbitration Procedure, which is the predecessor to the FINRA Code. *See Grant v. Rotolante*, 147 So.3d 128, 134 n.4 (5th DCA 2014) ("Prior to 2007, FINRA was known by its prior name, the National Association of Securities Dealers, Inc. ('NASD')."). The requirements for arbitration under the NASD are not materially different from FINRA Rule 12200, and the parties have relied upon *King* and *MONY*, and other cases arising under the NASD Code, to support their arguments.

6

not enter into an arbitration agreement only if there is no genuine dispute as to any material fact concerning the formation of the agreement." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016).

    B.    <u>Rule 12200 is Satisfied</u>

Rule 12200 states in pertinent part that "[p]arties must arbitrate a dispute under the Code" if (1) "[r]equested by a customer," (the "First Element") (2) "[t]he dispute is between a customer and a member or associated person of a member," (the "Second Element") and (3) "[t]he dispute arises in connection with the business activities of the member *or* associated person…." (emphasis added) (the "Third Element"). FINRA Rule 12200. I address each element in turn.

    1.    <u>The Cassis Family is a "Customer" (First Element)</u>

With respect to the first element, FINRA Rule 12100 defines the term "customer" this way: "[a] customer shall not include a broker or dealer." Rule 12100(k). There is no contention that a member of the Cassis Family is a broker or dealer, and thus, they are a "customer" as that term is used in the FINRA code. It is also undisputed that the Cassis Family filed a Statement of Claim with FINRA, (ECF No. 1-1), thereby requesting arbitration. Thus, arbitration here is "requested by a customer" and the first element of Rule 12200 is met.[2]

---

[2] DBSI does not appear to challenge the first element, as its argument is directed to the remaining elements of Rule 12200.

### 2. The Cassis Family's Claims Involve a Dispute Between a Customer and a Member (Second Element)

As noted, DBSI is a FINRA member. It argues that the Cassis Family is not its customer, because the Cassis Family did not purchase the Quintus Notes from DBSI and does not have an account with DBSI. (ECF Nos. 6 at 11, 16 at 5-6). The arbitrator may well agree with DBSI on this point, when it decides liability. But this Court faces the antecedent decision of determining arbitrability under FINRA Rule 12200. On that question, Eleventh Circuit precedent requires the conclusion that because (1) the Cassis Family was a customer of Llamas, and, (2) Llamas was an associated person of DBSI, then the Cassis Family was the customer of DBSI within the meaning of the Rule. At this juncture of the analysis, it does not matter whether Llamas was acting for DBSI when he sold the Quintus Notes. I reach this conclusion as follows.

It is undisputed that in 2013, the relevant time period, Llamas was an employee of DBSI with authority to trade in securities, and he was a registered representative of DBSI. (ECF Nos. 13-1 at 2-7, 13-2 at ¶¶ 3-5); *see also* (ECF No. 6 at 8) (conceding that "Mr. Llamas was also registered with DBSI…"). This renders him an "associated person" of DBSI – a fact that DBSI does not dispute.[3] DBSI also does not dispute that the Cassis

---

[3] Any such dispute would be without merit. FINRA Rule 12100(b) defines an "associated person" and an "associated person of a member" as "a person associated with a member, as that term is defined in paragraph (u)." Paragraph (u) defines the term "person associated with a member" as "[a] natural person who is registered or has applied for registration under the Rules of FINRA" or "…a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member…." FINRA Rule 12100(u). Llamas' status as an employee and registered representative of DBSI falls squarely within this language. *See also e.g., Dougherty v. VFG, LLC*, 118 F.Supp.3d 699, 712 (E.D. Penn. 2015) (holding that individual was an associated person of FINRA member within meaning of Rule 12200 where his BrokerCheck report identified him as "employed by and registered with" the FINRA member, he identified

8

Family was a "customer" of Llamas. What it does dispute is whether Llamas was acting in his capacity as an associated person of DBSI during the Quintus Notes transaction. (ECF No. 16 at 6). Eleventh Circuit precedent demonstrates that Llamas' capacity is not the relevant question when it is clear, and I have already noted that it is here, that Llamas was an "associated person" of DBSI during the relevant time period.

In *Multi-Financial Securities Corp. v. King*, an investor (King) initiated arbitration against a NASD member (IFG Network Securities, Inc.)[4] relating to a failed investment she made on the advice of a registered representative of IFG (Anthony Micciche). 386 F.3d 1364 (11th Cir. 2004). *King* addressed NASD Rules 10101 and 10301 (the predecessors to Rule 12200). Like the second and third elements of Rule 12200, they required an investor to "show that that his or her claim: involves a dispute between a member and a customer or an associated person of the member and a customer; and, arises in connection with the business activities of the member or in connection with the activities of the associated person." *Id.* at 1367.

IFG argued that it could not be compelled to arbitrate because, although it "concede[d] that King was Micciche's 'customer' as that term is used in the Code, IFG argue[d] that King was not *its* customer." *Id.* at 1368 (emphasis in original). IFG relied upon the following facts to support its argument: "Micciche never reported his activities

---

himself as the "registered representative" of the FINRA member, and he was an employee of the FINRA member with authority to trade in securities.); *Osborne v. Wells Fargo Advisors, LLC*, No. 2:11-cv-691-FtM-DNF, 2012 WL 2952533 at *3 (M.D. Fla. July 19, 2012) ("Plaintiff is a former employee of Defendant and registered under the Rules of FINRA making him an associated person as defined by FINRA Rule 1[2]100.").

[4] Multi-Financial Securities Corp. was formerly known as IFG Network Securities, Inc. *Id.* at 386.

9

involving King…to IFG, IFG did not approve of [the investment], IFG does not have any record of the purchase of this investment by or for King, King never opened an account with IFG, King does not have any written contract with IFG, and IFG did not receive or disburse funds for this transaction." *Id*. at 1366. Although there were disputes of fact regarding whether Micciche acted on behalf of IFG in connection with the transaction at issue, the district court compelled arbitration without an evidentiary hearing because "a customer's direct dealings with an associated person of an NASD member are sufficient to compel an NASD member into arbitration." *Id*.

The Eleventh Circuit affirmed, and held that "King's dispute with IFG is one between a customer and a member." *Id*. at 1367. It reasoned that King "satisfies the 'customer' requirement because she is not a broker or a dealer, even though she may not have been a direct customer of IFG." *Id*. at 1368. As already noted, the same is true for the Cassis Family.

The Eleventh Circuit next reasoned that King's dispute is with a NASD member because "[w]hen an investor deals with a member's agent or representative, the investor deals with the member." *Id*. at 1370 (citations omitted). It is undisputed here, that Llamas was a registered representative of DBSI, (ECF Nos. 6 at 8, 13-1 at 2-7, 13-2 at ¶¶ 3-5), and that the Cassis Family dealt with Llamas. Following the reasoning in *King*, the Cassis Family's dispute is with a FINRA member, DBSI.

Importantly, the *King* Court did not delve into the merits of whether Micciche acted as IFG's representative during the transaction. Instead it explained:

> [t]he parties agree that King dealt with Micciche, so King, in turn, dealt with IFG. The Court, therefore, holds that King has satisfied the first requirement [that her claim involves a dispute between a customer and a member] by demonstrating that she is a customer and that IFG is a member.

*King*, 386 F.3d at 1370. The same is true here. The parties agree that the Cassis Family dealt with Llamas during the Quintus Notes transaction, and according to *King*, the Cassis Family, in turn, dealt with DBSI. The Court need not resolve whether Llamas was acting on DBSI's behalf because *King* demonstrates that, for purposes of the second element of Rule 12200, which requires arbitration, it is enough that Llamas was DBSI's registered representative.

This conclusion is reinforced by the Eleventh Circuit's decision in *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004). In *MONY*, the investors (the Bornsteins) filed an arbitration claim with the NASD against MONY stemming from a failed investment they made on the advice of Lawrence Keller. *Id.* at 1341. Keller "worked in the financial-planning business, and he had affiliations with several businesses," one of which was MONY, a member of NASD. *Id.* Based upon Keller's recommendation, the Bornsteins invested in five viatical contracts through a company *unrelated* to MONY. *Id.* MONY filed suit seeking a declaration that arbitration was inappropriate and to enjoin arbitration. *Id.* at 1342. The district court granted the Bornsteins' motion for summary judgment, *id.* at 1342, and the Eleventh Circuit affirmed.

Relying on *King*, the Court found that the Bornsteins' dispute was between a customer and a member because "there is no dispute that the Bornsteins were customers of Keller and that Keller was an associated person with MONY." *Id.* at 1344. Even though

11

Keller was affiliated with several businesses, the Eleventh Circuit, as in *King*, was not concerned whether Keller was acting in his capacity as an associated person of MONY, or some other company, during the transaction. The Court explained:

> In our review of the district court's decision, we are unconcerned with MONY's cornucopia of disputed facts. Instead, we focus on those facts required to satisfy *King*'s two-part test. So while there many (*sic*) be dozens of disputed facts, the facts that matter in this case are undisputed: the Bornsteins were customers of Keller, who was an associated person of MONY. This undisputed fact pattern is somewhat common, and the overwhelming response is that the case is subject to arbitration.

*Id.* at 1346 (citing cases).

Because Llamas was an associated person of DBSI during the relevant time period, and the Cassis Family was a customer of Llamas, *King* and *MONY* demonstrate that the Cassis Family's dispute was with DBSI, a FINRA member, within the meaning of the second element of Rule 12200.

DBSI relies upon another Eleventh Circuit decision, *Wheat, First Sec. Inc. v. Green*, for the proposition that "the Eleventh Circuit requires a business or transactional relationship between the firm or the firm's associated persons *relating to the disputed transaction* before finding a customer relationship." (ECF Nos. 6 at 11, 16 at 6) (emphasis in original). In fact, the *Wheat* Court held something different: that "customer status for the purposes of the 'customer' requirement of NASD Code §§ 1 and 12(a) must be determined as of the time of the events providing the basis for the allegations of fraud." 993 F.2d 814, 820 (11th Cir. 1993). *Wheat* resolved an issue that is not before this Court. That ruling does

not change my conclusion that the Cassis Family satisfies the second element of Rule 12200.

In *Wheat*, investors instituted arbitration against Wheat First alleging that they purchased certain stock based upon misrepresentations made by an individual, Kentwood Brett Thackston, as agent for a different company, Marshall & Co. Securities, Inc. *Id*. at 815. After the allegedly fraudulent stock transactions, Wheat First entered into an asset purchase agreement with Marshall Securities. *Id*. at 816. The investors argued that Wheat First was liable as a successor in interest. *Id*. The district court held that Wheat First could not be required to arbitrate the stock dispute. *Id*. at 816. The Eleventh Circuit affirmed, finding that the investors were not customers of Wheat First at the time of events giving rise to their cause of action. *Id*. at 820.

The *Wheat* decision is not helpful to DBSI because there, unlike here, the individual at the center of the dispute had no connection to the NASD member at the time of the transaction at issue. Thackston was not alleged to be an employee or registered representative of Wheat First when the investors purchased the stock. In fact, the investors alleged something different: that Thackston was an agent of *Marshall Securities*. Moreover, Wheat First did not own Marshall Securities until *after* the allegedly fraudulent stock transaction occurred. Here, by contrast, it is undisputed that Llamas was an employee and registered representative of DBSI during the relevant time period, and the Cassis Family was a customer of Llamas.

The *MONY* Court reconciled its decision (and the *King* decision) with *Wheat* this way: "*Wheat* discussed timing for investors who were harmed by the firm's successor in

13

interest. In contrast, in both *King* and here, the investor was a customer at the time the events took place." *MONY*, 390 F.3d at 1345-46. The same is true for the Cassis Family – they were a customer of Llamas, who was an associated person of DBSI, at the time of the Quintus Notes transaction.

For the foregoing reasons, the Court concludes that the Cassis Family's dispute is between a customer and a FINRA member (DBSI) within the meaning of Rule 12200. To be clear, the Court is not holding that Llamas was acting in his capacity as an associated person of DBSI when he recommended the Quintus Notes to the Cassis Family; this Court need not resolve the dispute about his capacity. For purposes of satisfying the second element of Rule 12200, based upon *King* and *MONY*, it is enough that the Cassis Family was a customer of Llamas and Llamas was an associated person of DBSI during the relevant time period.

>        3. The Cassis Family's Dispute Arises in Connection with the Business Activities of DBSI Because of Their Negligent Supervision Claim (Third Element)

The third and final element of Rule 12200 requires that the customer's dispute "arise[] in connection with the business activities of the member *or* the associated person…." (emphasis added). FINRA Rule 12200. The "or" in the Third Element separates the two ways a customer can satisfy the element. First, the customer can demonstrate that his dispute arises in connection with the business activities of a FINRA member. *Or*, second, the customer can demonstrate that his dispute arises in connection with the business activities of an associated person. As explained below, I conclude that the Cassis

14

Family has established the first: their dispute arises in connection with the business activities of a member, DBSI.

DBSI argues that the Cassis Family's claims do not arise in connection with their business activities because Llamas allegedly acted on behalf of other Deutsche Bank entities, and the Quintus Notes transaction did not include any brokerage services or securities activities in the United States. (ECF Nos. 6 at 15, 16 at 4). In making this argument, DBSI ignores that the Cassis Family has asserted a claim that DBSI negligently supervised Llamas (and other unidentified individuals). (ECF No. 1-1 at p. 9 ¶ 31, p. 10 ¶ IV(d)). This claim is decisive under Eleventh Circuit precedent. As the Court made clear in *MONY*, the Cassis Family's negligent supervision claim is a dispute, for purposes of Rule 12200, that arises in connection with the business activities of DBSI.

The NASD member in *MONY* argued, as DBSI does here, "that the events did not arise in connection with its business because the Bornsteins invested in viatical contracts with an unrelated company [and]… its only connection to the Bornsteins was through an intermediary (i.e., Keller), and its duty to supervise Keller was not part of its business." *MONY*, 390 F.3d at 1344. The Court rejected that argument, reasoning:

> it is irrelevant that the Bornsteins invested with an unrelated company; what matters is that Keller was also an associated person with MONY…Moreover, the Eleventh Circuit and most other courts hold that supervision of associated persons arises in connection with the member's business.

*Id*. at 1344-45. The *MONY* Court cited, among other cases, the earlier decision in *King*. *Id*. There, the existence of a negligent supervision claim was critical: the Court held that "King's dispute arises in connection with the IFG's business" because "King's claim of

15

negligent supervision satisfies the Code's second arbitration condition [that the dispute arise in connection with the business activities of a member]." *King,* 386 F.3d at 1370 (citing cases). In both cases, the Eleventh Circuit rested its decision on the first clause of the Third Element, that requires that the customer's dispute arise in connection with the business activities of a member. Applying *King* and *MONY*, I conclude that the Cassis Family's dispute arises in connection with the business activities of a member, DBSI, because they have asserted a claim that DBSI negligently supervised its associated person, Llamas.

DBSI directs the Court to the Eleventh Circuit's decision in *Pictet Overseas, Inc. v. Helvetia Trust*, 905 F.3d 1183 (11th Cir. 2018). DBSI argues that *Pictet* requires the Court to resolve the capacity question, that is, whether Llamas was acting on DBSI's behalf when he marketed the Quintus Notes, in order to determine if the third element is satisfied. I disagree. As explained below, *Pictet* does not drive the decision here, for two reasons. First, the analysis in *Pictet* is expressly limited to the second clause of the Third Element (i.e., whether the customer's dispute arose in connection with the business activities of *an associated person*). As I have explained, the Cassis Family established the first clause (that their dispute arises in connection with the business activities of a member), which *King* and *MONY* directly address. Second, the alleged wrongdoer in *Pictet* had *no connection* to a FINRA member or to an associated person, whereas here the parties agree that Llamas was an employee and a registered representative of DBSI during the relevant time period.

In *Pictet*, two investment trusts chose an *independent* investment advisor, Brian Callahan, to manage their investments. *Id.* at 1185. Through Callahan, the Trusts opened

16

custodial accounts at Banque Pictet in Geneva. *Id*. After the Trusts wired money into their accounts at Banque Pictet, Callahan stole the money. *Id*. at 1186. The Trusts filed a FINRA arbitration against eight individuals who had owned Banque Pictet as partners (the "Partners") and several affiliates of Banque Pictet, including Pictet Overseas, a Canadian broker-dealer the Partners also owned. *Id*. at 1185. Pictet Overseas was a member of FINRA; Banque Pictet and the Partners were not. *Id*. Pictet Overseas and the Partners filed suit to enjoin the arbitration and, after a bench trial, the district court agreed that the Trusts failed to satisfy Rule 12200 and permanently enjoined the arbitration. *Id*.

The Eleventh Circuit addressed only the second clause of the Third Element, whether the Trusts' dispute arose "in connection with the business activities of the associated person." *Id*. at 1188. The Trusts made no argument that the dispute had some connection to Pictet Overseas' (the FINRA member's) business activities. *Id*. ("the Trusts do not contend that the dispute has any connection to Pictet Overseas's business activities, so we cannot say that the Trusts' claims are arbitrable because they arose in connection with a member's business activities."). Instead, the Trusts argued that their dispute "arose in connection with the business activities of the Partners who, the Trusts claim, are associated persons of Pictet Overseas." *Id*.

The Eleventh Circuit assumed for purposes of the appeal that the Partners qualified as associated persons of Pictet Overseas. *Id*. at 1190. It concluded that:

> At best, the Trusts' claims arise out of the Partners' business activities undertaken as general partners of Banque Pictet. But Bank Pictet is not a FINRA member. Because the Trusts' claims have no connection to the business activities of Pictet Overseas or of the Partners undertaken in their capacity as associated persons of Pictet Overseas,

17

> we agree with the district court that this dispute is not arbitrable under Rule 12200.

*Id*. The Court reasoned that "we understand the FINRA Arbitration Code to require an *associated person* to arbitrate a dispute before FINRA only if the dispute has some connection to the associated person's relationship with a FINRA member." *Id*. at 1189 (emphasis added).

*Pictet* reflects that the court must determine whether an associated person acted in his capacity as an associated person of a member in a narrow circumstance: when deciding whether the dispute arises in connection with the business activities of the *associated person* (that is, the second clause of the Third Element). Here, by contrast, I have made no finding that the Cassis Family's dispute arises in connection with the business activities of an associated person (Llamas). Rather, the Cassis Family argues – and I agree – that their dispute arises in connection with the business activities of a member (DBSI) because they have asserted a claim that DBSI negligently supervised its employee and registered representative, Llamas. Their negligent supervision claim is a key difference between this case and *Pictet*.[5]

In *Pictet*, the district court explicitly found that the alleged fraudster, Callahan, "was never an employee, registered representative or agent" of Banque Pictet or Pictet Overseas, and did not have any relationship with those companies. *See Pictet Overseas, Inc, et al. v.*

---

[5] Indeed, the Eleventh Circuit recognized the effect that a negligent supervision claim could have on the outcome when it noted that "a customer's claim that an associated person…failed to properly supervise the business activities of the FINRA member potentially would be arbitrable under Rule 12200 because this claim would arise out of business activities of the associated person in his or her capacity as an associated person of the FINRA member." *Pictet*, 905 F.3d at 1189.

18

*Helvetia Trust, et al.*, Case No. 13-81088-CIV, 2017 WL 10403345 at *2 (S.D. Fla. April 14, 2017). The Eleventh Circuit similarly recognized that Callahan was an entirely *independent* investment advisor. *Pictet*, 905 F.3d at 1185. In sharp contrast, the parties agree that Llamas was both an employee and a registered representative of DBSI during the relevant time period. This fact, coupled with the Cassis Family's negligent supervision claim, distinguishes this case from *Pictet* and places it squarely within *King* and *MONY*. Indeed, the district court in *Pictet* distinguished *King* and *MONY* because the alleged fraudster in *Pictet* "was never a representative of [Pictet Overseas], Banque Pictet or the [Partners]." *Pictet*, 2017 WL 10403345 at *6.

In sum, guided by *King* and *MONY*, I conclude that the Cassis Family's claim that DBSI negligently supervised its associated person, Llamas, arises in connection with the business activities of DBSI, a FINRA member (the first clause of the Third Element). This Court is very clear that, as the *King* court cautioned, "the validity of [the Cassis Family's] underlying claim is irrelevant" to determining arbitrability. *King*, 386 F.3d at 1365 n.1. Indeed, the Supreme Court has long cautioned that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986).

For these reasons, the Court concludes that the Cassis Family has satisfied all three elements of Rule 12200.

### III.   RECOMMENDATION

For the foregoing reasons, I **RESPECTFULLY RECOMMEND** that the Court

**DENY** Plaintiff's Motion for Preliminary Injunction (ECF No. 6) and **GRANT** Defendants' Motion to Dismiss and Compel Arbitration (ECF No. 12).

**No later than August 30, 2019** the parties may file any written objections to this Report and Recommendation with the Honorable Darrin P. Gayles, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED in chambers at Miami, Florida, this 20th day of August, 2019.

_____
CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE


cc: The Honorable Darrin P. Gayles
    Counsel of record